[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this dissolution of marriage case, the plaintiff husband and the defendant wife are at odds about nearly every aspect of their married life together and their futures as separate individuals. Unfortunately, they have two minor children who are caught in the middle of this struggle.
The plaintiff Ellen Cohen and the defendant Peter Cohen were married on June 7, 1987. There are two children who are issue of the marriage: Seth, born July 19, 1990; and Joy, born April 18, 1994. The plaintiff is 37 years old and practices dentistry. The defendant is 43 years old and is a skilled woodworker and cabinetmaker. Seth, who is now seven years old, is hearing-impaired. Seth aspirated meconium at birth and was hospitalized for several weeks on ECMO life support. He was diagnosed at age 2 with a significant high frequency hearing loss. He has been fitted for hearing aids to help him preserve the ability to hear what he can. He has been evaluated at the Clarke School for the Deaf in Northhampton, Massachusetts, to determine how best to meet his educational needs. He is going to school in his regular school district, with some special programming for him.
Seth is a troubled child in some ways. His ability to communicate is impaired by his hearing loss. Although he scores above average cognitively, his social development lags behind. He displays above average impulsivity and anxiety and displays dominating and compulsive behaviors. He is easily frustrated. He loses control at times and acts out his frustration or anger in a physical way, such as throwing serious tantrums, breaking things or hitting. He attends psychotherapy with Dr. Eric Millman.
Joy is three years old. She has no special physical challenges. She has been cared for during her parents' work days by her maternal grandparents.
The separation of the parties occurred in April of 1996, when CT Page 10827 the plaintiff complained to the police that the defendant had been physically abusive to her during a disagreement in their Wallingford home. The court considering the criminal case, G.A. #7 in Meriden, issued a protective order against the defendant, who eventually relocated to a modest rental apartment in Meriden. After a pendente lite hearing, this court entered an order of joint custody of the two minor children, with a shared residence schedule of approximately equal duration at each parent's home, alternating every few days. This court at that time hoped that when tempers cooled and hurt feelings healed, the parents would be able to consult with one another, make flexible arrangements between themselves for the children's benefit, and begin to behave more charitably toward one another. The court expressed the hope that the pendente lite order was the chance to make cooperative parenting work. The evidence is now clear that the court's hope is unfulfilled.
The plaintiff is a dentist with her own private practice. She is not good at running the business, partly from inattention to business details and partly from a willingness to ignore the requirements of the laws, such as those concerning insurance fraud. She derives a personal gross income of $1575 per week from her practice. The court finds this to be her current earnings level, although if she were able to run her practice more competently, her earning capacity would be greater.
The defendant is a skilled cabinetmaker who was a valued employee for years at Breakfast Woodworks. In late 1995, he cut through his hand with a power saw, severing part of a finger and injuring his thumb. He was out of work for many months, during which he underwent surgery and rehabilitation of his hand. He has now recovered much of the dexterity in the hand, and can resume work at a normal rate of pay for a carpenter and woodworker. His former job is no longer available. His current income is from unemployment compensation annualized at a gross of $17,000. He has a worker's compensation claim pending for the injury which occurred on the job. His earnings were formerly $40,000 per year gross: $770 per week. Taking into account the period of his incapacity, the court finds his current earning capacity to be $35,000 per year.
For some months before the April 1996 separation, the defendant had begun to work in the plaintiff's dental practice to assist in organizing the office accounts, evaluate and manage the personnel, and attempt to improve the profitability of the CT Page 10828 practice. He had also for many months begun to move substantial sums of cash into an account in his own name. While the defendant's explanation of the reasons for this movement of monies is largely benign, the plaintiff became alarmed and construed it as an attempt by the defendant at self-dealing to the detriment of the practice and as an attempt to control and sequester assets of the marriage.
The plaintiff paints the defendant as physically abusive and emotionally cruel. She portrays herself as meek and as one who is without the emotional resources to defend herself and her children from him. The defendant has accused the plaintiff of being a dishonest individual who cannot cope with reality and who cannot be trusted with the children. Neither of these profiles is entirely true.
The plaintiff is afflicted with obsessive-compulsive disorder. She has suffered from an obsession with contamination during the entire course of the marriage. She is completely unable to abide the idea of any stray food, grease or dirt in the home. She cleans compulsively and takes extraordinary steps to ensure that no one in the home contributes to the contamination of the environment. Her cleaning behaviors are ritualized, such that they do not actually provide a cleaner home, but rather serve a reassuring and calming function for her.
The behaviors and rules she imposes on herself and on others who come to the home range from the merely eccentric, such as a rule that one must remove one's shoes before entering the house, to the anti-social, such as a prohibition on allowing her children to have playmates in the home. She stays up late at night after others have gone to sleep to clean. She allows no food to be eaten anywhere in the house except the kitchen. She often feeds the children in the car in order to prevent the introduction of contamination from take-out food in the house. No guests are invited to the home. She refuses to allow any carpeting or rugs in the house. The children are not allowed to collect found objects. If the children have fallen asleep before it is their bedtime, she awakens them to bathe them. Her behaviors are so ritualized that they often interfere with her ability to function appropriately. For example, she is sometimes late to appointments outside the home because she cannot bear to forego her cleaning ritual.
While this disability seemingly has not affected the CT Page 10829 operation of her dental practice, has created a bizarre home life for the two minor children. Children learn how to negotiate with and around adults as part of their normal development. They learn to test e limits of authority. They learn which "rules" are important, which are flexible, and which are not really rules at all. The plaintiff's rules are askew. Her rules brook no exceptions. The plaintiff becomes distraught and panicky if she is unable to compel compliance. Her rules are the most important part of her life.
The plaintiff has been in therapy many times. She has been non-compliant with treatment regimens. She does not admit that her behaviors are a problem for her or for her family. She believes that her rituals do not intrude on her life or the lives of others. She claims that she is no longer compulsive about certain things, such as prohibiting neighborhood children from coming into the house to play. The court finds otherwise. Whether consciously so or unconsciously guided by her obsessive-compulsive disorder, the plaintiff has attempted to hide many aspects of her behavior from others. She has lied about some of these to the court. She justifies much of what she does by claiming to be victimized or misunderstood. She has great difficulty taking responsibility for her actions.
She is so busy dealing with the forest of her obsessions that she is unable to see the trees planted before her by her children. Seth was prescribed hearing aids, and it is essential that he wear them and that they be properly maintained to preserve what is left of his hearing. Seth is supposed to wear them every waking minute, a requirement that Seth, as a small, active boy, resists. Each night the hearing aids are to be taken off, the batteries removed, the appliances thoroughly cleaned, and the next morning the batteries reinstalled and the appliances checked to ensure that they are adjusted and operating properly.[1] Given Seth's age and stage of development, an adult must perform and oversee this process. If ever there were an important ritual to perform, this is it. The plaintiff has failed to do this on many occasions. Also, she sometimes has acquiesced in Seth's demands to take the appliances off and not wear them as prescribed, rather than spark a confrontation with Seth.
Another example is the failure of the plaintiff to help create an appropriate physical space for Seth. A specific recommendation of the Clarke evaluation team for Seth was that CT Page 10830 his environment be made "soft," that is, with carpeting and draperies and upholstery so that sound does not echo or reverberate, allowing Seth the chance to hear better. The plaintiff has refused to allow such modifications in her home. Even though this was raised as an issue at the pendente lite hearing, so that the plaintiff knew that it was a potential criticism of her parenting ability which was easily correctable by her, she has been unwilling or unable to make this adjustment for Seth's benefit and for her own. She says she will do it at some point in the future, not now.
Her interaction with her children is not as bleak as the structure she has provided for them. She is warm and loving with them. She is physically affectionate. Her parents live nearby so that the children know and interact with their maternal grandparents regularly. On issues that do not impinge on the pathological structure she has set up, she can be easy going and relaxed. There is no question that the children love her and look to her as a profound and controlling influence on their lives.
The defendant was, from the first, aware of the plaintiff's ritualistic behaviors but tolerated them and supported her occasional efforts to get help for them. The defendant allowed the plaintiff to impose her sense of structure on the parties' home life, seemingly because it was so important to her and he loved her very much. The parties were overjoyed at the birth of their children and they struggled and supported one another emotionally during Seth's serious illness and hearing loss, the plaintiff's troubles with the law, and the defendant's diagnosis of cancer, his successful treatment for it, and his subsequent occupational injury. The stress on this couple has been enormous. The parties participated in marriage counseling to attempt to work out their problems. The defendant continues to attend individual therapy.
The defendant's initial reaction to the plaintiff's filing this action was hostility and disbelief. In fact in the months leading up to the separation, the defendant had grown increasingly hostile to the plaintiff at home. While for long stretches of time he was compliant, even passive, in the face of the plaintiff's odd organization of the household, his frustration would often surface in non-constructive ways. There were loud, angry arguments between the plaintiff and the defendant to which the children were witness. Indeed the defendant provoked some of these by his attempts to direct the CT Page 10831 course of things in the family home, rather than acquiesce in the plaintiff's decisions. On more than one occasion in anger, he purposely took food items and spread them around to the dismay of the plaintiff. On at least the occasion that led to the separation, the defendant in exasperation attempted to physically restrain the plaintiff. The court does not find that the defendant was constantly physically abusive as the plaintiff claims. But his increasing inability to cope with the intractable behavior of the plaintiff, even though he realized it was not purposely directed at him, began to erode the foundations of this marriage.
This response coupled with the plaintiff's difficulty in general in dealing with stress led to a complete breakdown in communication and cooperation between the parties particularly in dealing with the children. Since that time the defendant's temper has cooled. He has been able to focus more on the children and their needs. Were this not so, the court could not consider him to be a proper custodian of the children, either solely or jointly.
Throughout the marriage the defendant has taken a major role in dealing with Seth and Joy. Although the organization of the home was ceded to the plaintiff, the parties have shared all other aspects of raising the children, home-making, and bread-winning. In fact the major share of dealing with Seth's evaluation, treatment, education, and therapy has fallen on the defendant. The defendant is affectionate, caring and careful with his children. They love him and look to him for guidance and for balance. Seth in particular needs the kind of structure that, as between the parties, only the defendant can provide. Seth's problems with social and emotional development need immediate and serious attention. Seth's oppositional behavior places him at risk for further developmental delay. Both parents are disturbed by Seth's behavior, but the plaintiff is especially at a loss as to how to deal with it. She blames most of it on Seth emulating his father's outbursts, and does not see it as emanating from Seth's own personality. Her reaction to Seth's confrontational behavior is often to give in to the boy's demands, as long as it does not involve one of her rules, to most of which he has now adjusted. Perversely, in the plaintiff's household, Seth is learning to follow the otherwise empty regimen set by the plaintiff's compulsiveness, and to oppose (because he is successful at it) the appropriate structure to which he should be learning to adapt. CT Page 10832
The defendant, unlike the plaintiff, has gained sufficient insight into the dynamics of the family's relationships to begin to work constructively to provide a healthy environment for the children. The plaintiff continues to be unaware of or to deny her own role in creating the difficulties for the children that now exist.
The children have a loving relationship with both parents. They need regular contact with each parent. But since the parents cannot cooperate and communicate about the children's upbringing, the court must unfortunately look to only one parent to whom to assign the responsibility for decision-making and to whom to assign the primary role of custodian. The defendant, more than the plaintiff, has been able to act responsibly on behalf of these children. The court finds that the plaintiff, at this time, is incapable of adequately addressing the needs of the children as a sole custodian, even with the assistance of her extended family.
The court takes no pleasure in assigning custody to the defendant. He has serious deficits as demonstrated by his contributions to the breakdown of this marriage. His intensity and rigidity, while of concern to the court, does not substantially interfere with his ability to provide for the children's needs at this time. In fact, as between the plaintiff and the defendant, the court finds that only the defendant is currently capable of providing a home life, as well as a life outside the home, with a healthy structure that these children so desperately need.
The court assigns the custody of the two minor children to the defendant. The residence schedule contained in the pendente lite order shall remain in effect until 4:00 P.M. on Friday, November 7, 1997, at which time the visitation schedule shall be as follows: the plaintiff shall have visitation with the children beginning Thursday, November 13, 1997 after school or day care (or if on a Thursday, school or day care is not is session, at noon) until Sunday, November 16, at 6:00 P.M. and shall thereafter have the same hours on Thursday to Sunday on alternate weekends; and in the intervening weeks, the plaintiff shall have the children for visitation from Wednesday at 4:00 P.M. until Friday at 4:00 P.M. The plaintiff shall be entitled to four weeks of visitation with the children during the summer when school is not in session, but shall not be entitled to take more than two CT Page 10833 of such weeks consecutively. The defendant shall be entitled to two weeks of summer visitation which may be taken consecutively. During any period of plaintiff's visitation of a week or more in which she and the children are not traveling out of state, the defendant shall be entitled to a five hour period with the children in his custody during the afternoon/evening hours at least once each five days.
The parties shall confer and attempt to agree upon flexibility in the schedule such that holidays and days special to the parties or the children are shared or alternated. The children shall have reasonable telephone, fax or E-mail contact with the parent with whom they are not in residence.
At the time of this marriage, the plaintiff had about $13,000 in savings and a car and had about $37,000 of debt, largely from student loans. The defendant had accumulated savings of $150,000 at the time of the marriage and had no significant debt. He also had a car. The parties made substantial investments into the Wallingford home, both for purchase and for renovations. They also invested in the purchase of equipment, fit-up, and capitalization of the plaintiff's dental practice. The family of the defendant has been especially generous to the parties during the course of the marriage. When the defendant was ill with colon cancer in 1992, the defendant's brother made a gift of $80,000 to the couple. The joint earnings of the plaintiff and the defendant have never alone been sufficient to support the lifestyle they have enjoyed.
Aside from some cash that the parties have, their two major assets are their Wallingford home and the dental practice. The court finds the value of the dental practice to be $97,500. The court finds the fair market value of the Wallingford home to be $270,000, with a mortgage of $234,000, for a net equity of $36,000.
The plaintiff has a Bear Stearns IRA and Keogh valued in June 1997 at $39,000. There is an escrow account held by her counsel of $5400. She has one or more accounts in Dime Bank amounting to $1100.
The defendant has an IRA with Bear Stearns valued in June 1997 at $41,400 and a 401k from his employment at Breakfast Woodworks of $5700. There is approximately $69,000 in a Bear Stearns account held by the defendant that the plaintiff claims CT Page 10834 was all generated by her dental practice and was misappropriated by the defendant.
The court declines to undertake the tracing of each dollar throughout this marriage. Each party has made contributions both financial and non-financial to what now exists. Although control, and later sequestration and diversion, of family funds were issues in this case, neither party appears to have "wasted" funds. The court is mindful of its prior orders regarding use or retention of certain accounts, designed to preserve assets that were diverted from some accounts into others by each of the parties. Unfortunately, the expenses of this contested litigation have eroded the assets of both parties which might otherwise remain for the court to divide.
The court enters a decree dissolving the marriage. Based on the evidence and the dictates of Conn. Gen. Stats. Sec. 46b-81
and 82, the court enters the following orders:
Neither party shall pay alimony to the other.
The Wallingford home shall be promptly sold and the net proceeds shall be divided 50% to the plaintiff and 50% to the defendant.
The plaintiff shall keep her retirement accounts, the "escrow" funds, and the Dime Bank account that is in her own name. The defendant shall transfer to the plaintiff the two certificates of deposit listed on his affidavit in Dime and People's of $3000 each. The defendant shall be entitled to keep his retirement accounts, the People's checking and People's and Dime savings accounts listed on his affidavit, and the Bear Stearns account.
The plaintiff shall be entitled to keep all the furniture and furnishings in the home, except she shall promptly return to the defendant all camera equipment, the computer he used, and the benches, tools, and other items he used in his trade, his books, his LP collection and any art work and wood carvings made or collected by him. Further the plaintiff shall allow the children to transfer the defendant's home such personal items used by them as shall make them comfortable. The parties shall equitably divide family photographs.
Each party shall pay any debt standing solely in the name of CT Page 10835 that person, and shall indemnify and hold the other harmless from payment of any such debt.
The reasonable charges of the attorney for the minor children totals $21,000, which the court orders paid as follows: giving the plaintiff credit for $1779.25 paid, she shall pay $8720.75; and giving the defendant credit for $7813 paid, he shall pay $2687. The attorney for the minor children shall be entitled to appropriate security by way of judgment lien or other execution upon presentation by her to the court of evidence of the unfulfilled obligation. The attorney for the minor children shall dispose of or release the children's funds in her possession as the parties agree in writing, but if no such agreement is forthcoming as to the disposition or release of the children's funds, the attorney for the minor child shall petition this court for advice as to the appropriate trustee for such funds.
The former counsel of the minor children shall be paid any remaining balance on his fees in full as was previously agreed or ordered.
The parties shall share equally the charges of Dr. Kenneth Robson.
The defendant shall pay any costs attendant to the appearance of witnesses Schreibman and Natiel.
Responsibility for payment of capital gains taxes, if any, on the sale of the residence shall be allocated in proportion to the allocation of net proceeds between the parties. Any tax deficiency related to the plaintiff's dental practice shall be her responsibility to pay and she shall do so and hold the defendant harmless and indemnify him from liability for such payment. This includes any deficiency related to any misstatement of the plaintiff s income or deductions on the joint personal tax returns of the parties. Likewise should there be any tax deficiency related to any misstatement of the defendant's income or deductions on any joint personal income tax returns, he shall pay such deficiency and shall indemnify and hold the plaintiff harmless from liability for such payment.
The defendant has a claim for worker's compensation benefits as a result of his work-related injury. The parties and their children all suffered financially as a result of the defendant's recuperation and inability to work over a period of time. In the CT Page 10836 event the defendant receives any sums as a result of the worker's compensation claim, or any other claim for personal injuries arising out of the injury to his hand, he shall remit 40% of such sums to the plaintiff.
The parties shall pay all outstanding and prospective medical bills and therapy charges for the minor children 75% by the defendant and 25% by the plaintiff. The defendant shall provide health insurance coverage for the two minor children as shall be available at a reasonable charge through his employment. In the event no such benefit is available through employment, the plaintiff shall provide and pay for health insurance for the two minor children through any COBRA coverage available or shall purchase a private policy.
Pendente lite orders of child support terminate with this judgment. Beginning prospectively and payable beginning Monday, November 3, and each Monday thereafter, the plaintiff shall pay child support to the defendant of $300 per week for the two minor children. The court finds this to be in accordance with the child support guidelines based on allowable deductions under the guidelines from the plaintiff's demonstrated earning capacity of $1575 per week gross and the defendant's earning capacity of $675 per week gross. In the event that the provision of health insurance for the minor children results in a cost to either party, such that the child support is not in accordance with the child support guidelines, this order may be modified to bring it within the child support guidelines, but neither party shall withhold the payment of child support in full or the payment of a premium for health insurance in full as ordered in this decision without further order of the court.
The court retains jurisdiction to determine any claims of arrearages on pendente lite orders.
Patty Jenkins Pittman, Judge